**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| V. | )     CR 418-153 |
| | ) |
| **FRANK H. BYNES, JR.** | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

In the course of operating one of the largest, most prolific, and damaging pill mills in the history of the Southern District of Georgia, Frank Bynes destroyed the lives of thousands of people in this community and wasted valuable resources of safety net programs (Medicare, Medicaid, and Tricare). Frank Bynes destroyed the lives of people to whom he swore to "do no harm," yet chose to exploit. But it was not just the patients he saw in those clinics who suffered from this criminal enterprise. The full scope of harm caused by Frank Bynes also includes the innocent bystanders—the mothers, fathers, siblings, children, and friends of his patients—who were forced to witness their loved ones become shells of the vibrant people they once were. For these reasons and those set forth below, the Court should reject Bynes's objection to the Presentence Report and sentence him to the high end of the guidelines—293 months.

**I.  FRANK BYNES OBSTRUCTED JUSTICE UNDER 3C1.1.**

The Court should overrule Bynes's objection and apply the enhancement for obstruction of justice. Section 3C1.1 provides for a two-level increase to the defendant's base offense level if "(1) the defendant willfully obstructed or impeded, or

attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing" of his offense of conviction, and "(2) the obstructive conduct related to ... the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. Application notes to section 3C1.1 list examples of conduct warranting the enhancement, including "committing, suborning, or attempting to suborn perjury." *Id*. § 3C1.1, comment. (n.4(B)).

The Eleventh Circuit has explained that, "[a] defendant's testimony constitutes perjury when the testimony: (1) is made under oath; (2) is false; (3) is material; and (4) is "given with the willful intent to provide false testimony and not a result of mistake, confusion, or faulty memory." *United States v. Vera*, 639 F. App'x 580, 581 (11th Cir. 2016) (quoting *United States v. Singh*, 291 F.3d 756, 763 n. 4 (11th Cir. 2002)); *United States v. Durrett*, 524 F. App'x 492, 498 (11th Cir. 2013) ("For the purposes of § 3C1.1, 'material' means evidence, fact, statement, or information that, if believed, would tend to influence the issue under determination."). Of particular note, the Eleventh Circuit has upheld the application of the obstruction enhancement when a defendant's testimony at trial is "contradicted flatly" and "irreconcilable" with other evidence. *See, e.g., United States v. Stahlman*, 934 F.3d 1199, 1228 (11th Cir. 2019), cert. denied, No. 19-6315, 2019 WL 6107893 (U.S. Nov. 18, 2019) (upholding application of enhancement where trial testimony of defendant contradicted by other evidence); *United States v. Benner*, 442 F. App'x 417, 424 (11th Cir. 2011) (upholding enhancement when defendant testified he was not fully aware of what he was doing and he "did not think there was anything wrong").

During trial, Bynes testified in his own defense, under oath, and in the course of his testimony made repeated willful, material false statements. The Government has identified at least six examples of false statements that warrant a two-level increase to Bynes's base offense level.

1. <u>Bynes Falsely Testified Law Enforcement Agents Held a Gun to His Head</u>.

A significant point in the Government's case was testimony regarding an interview between Bynes and law enforcement agents on the day agents searched his medical clinic. During this interview, Bynes made specific admissions and false statements. When defense counsel asked Bynes about this interview at trial, Bynes attempted to justify these lies by falsely claiming that agents threatened him at gunpoint:

| | |
|---|---|
| Defense Counsel: | And [the Special Agent] said you lied to them. Did you lie to that agent that day? |
| Bynes: | Yes, I did. |
| Defense Counsel: | And why did you lie to the agent? |
| Bynes: | September 21, 2017, that's a day I will never forget. I'm in my office, and an agent comes into my office. He had a DEA bulletproof vest on. He has a handgun in his hand and he put it right up to my head, and that immediately threw me into shock.<br>I am not expecting that anyone come up to me and put a gun up to my head, and he tells me "I got you now. We got you now. You going to prison." |

Tr. 531:6-12.

During the Government's rebuttal, two federal agents who interacted with Bynes specifically rejected his claim. *See* Tr. 681–83.

3

2. <u>Bynes Falsely Claimed to be a Winner of the Congressional Medal of Honor</u>.

A point of emphasis of Bynes's testimony during his case was to convince the jury that he was an experienced, credentialed physician. Touting his purported credentials, Bynes attempted to convince the jury that his decisions as to how to treat certain conditions of patients were within the usual course of professional practice and for a legitimate medical purpose. Among other credentials he represented to have received previously, Bynes told the jury he was awarded the Congressional Medal of Honor:

| | |
|---|---|
| Bynes: | I also got an award from the US Congress. I'm trying to remember the title of it. It was -- oh, Congressional Medal of Honor from US Congress, and the reason why they gave me that award is once I got out of the Air Force and I was discharged from the Air Force, I actually became a medical adviser for US Congress for ten years. |

Tr. 535:6–11.

Bynes later acknowledged he did not win the Congressional Medal of Honor, while attempting to describe a different Congressional award he "received":

| | |
|---|---|
| Government Counsel: | Dr. Bynes, you told the jury this morning you received the Congressional Medal of Honor, which is our nation's highest award for valor in combat? |
| Bynes: | I received the Congressional Medal of Distinction from Congress, from US Congress. |
| Government Counsel: | You never received a Congressional award? |
| Bynes: | Not a -- of distinction, not from honor. |

Tr. 668:23 through 669:4.

Publicly available information also belies any contention Bynes was a winner of the Congressional Medal of Honor.  *See also* National Medal of Honor Museum, Recipient Database *available at* https://mohmuseum.org/recipient-database/.  The Government was unable to find any support that the "Congressional Medal of Distinction from Congress" is a real award, let alone one awarded by the United States Congress to Bynes.

    3.  <u>Bynes Falsely Described his History of Military Service</u>.

As further part of his effort to convince the jury he possessed superior expertise, Bynes testified as to his prior military service:

> Bynes:    After I finished the second residency internal medicine, this is when I actually volunteered to go into the United States Air Force because this is the time that the Vietnam war is like getting out of hand, so as I went in, the air force gave me credit for my surgical and internal medicine training, so I went in as what we call a major, which is what we call an O4.

Tr. 518:4–9.

> Bynes:    I was also in the United States Air Force. When I was in the air force I was also assigned to a MASH unit. That's a mobile army surgical hospital . . . On a combat field, every infantry soldier has morphine in his backpack, and the reason for that is when you get injured, your buddies is going to take your morphine, give you an injection and then going call the medic.
>
> In the military world, we call Bravos now. In the Vietnam we had to change your language, but morphine is given intramuscularly. When we say IM, it starts working in about three minutes.

Tr. 657:23 through 658:12.

Bynes's testimony about his military service during the Vietnam War is materially and willfully false.  Bynes briefly served in the United States Air Force

5

from 1986 to 1987—over a decade *after* the Vietnam War ended with the Fall of Saigon in 1975. Further, while briefly in service, Bynes failed to even obtain a medical license, which caused his commander to recommend that he be separated from service. *See* Exhibit C (separating by accepting a voluntary resignation: substandard performance of duty in lieu of involuntary discharge).

4. Bynes Falsely Represented to Patients That He Worked for the Department of Justice.

Another significant theme of the Government's case was to present evidence that Bynes, in the course of operation of his pill mill, represented himself to be law enforcement in an attempt to intimidate his patients. When asked about this at trial, Bynes falsely denied making such a claim:

| | |
|---|---|
| Government Counsel: | Let me rephrase. Did you ever tell a patient you worked for the Department of Justice? |
| Bynes: | Oh, no, I never told a patient. |

Tr. 666:9–11.

Exhibit 2B, admitted at trial, includes a text message in which Bynes tells Cristy S., his patient, he was "Department of Justice." *See also* Tr. 199:19–24. Witnesses also testified that there was no record of Bynes ever having served with the Department of Justice. *See* Tr. 201:9–23.

5. Bynes Falsely Claimed the "International Society of Police Surgeons"—a New York Corporation that Sells Law Enforcement Badges Online—was Part of the Department of Homeland Security.

As noted previously, a clear effort of the Bynes's trial strategy was to convince the jury that he was an experienced, credentialed physician. One specific credential

that Bynes emphasized was his position with the International Society of Police Surgeons. Attempting to give the organization (and himself) an air of legitimacy, Bynes falsely claimed that the International Society of Police Surgeons was part of the Department of Homeland Security:

| | |
|---|---|
| Government Counsel: | Okay, International Society of Police Surgeons, you said that's affiliated with the surgeon general's office; is that right? |
| Bynes: | Initially, yes. |
| Government Counsel: | At some point, moved under the Department of Homeland Security? |
| Bynes: | Yes, sir. |
| Government Counsel: | The International Society of Police Surgeons is a corporation out of New York with some guy name Sheldon in Wappingers Fall, New York; isn't that right? |
| Bynes: | He's the -- if I'm not correct, he's the president. |
| Government Counsel: | Correct, not the surgeon general? |
| Bynes: | No, he's not the surgeon general. |
| Government Counsel: | It's a company, a corporation, in the State of New York? |
| Bynes: | The headquarters is in New York. |

Tr. 667:2–16.

The "International Society of Police Surgeons" is not part of the Department of Homeland Security or the Surgeon General's office. *See* Tr. 683 (testifying that the United States Surgeon General's Office is under the Department of Health and Human Services and that the International Society of Police Surgeons has no

7

affiliation with the United States Government; International Society of Police Surgeons, available at http://www.isps1.org/. Bynes's attempt to impress the jury with his purported credentials went to a central issue in dispute—the legitimacy of his practice—and was materially false.

    6. <u>Bynes Falsely Claimed He Did Not Have Any Sexual Relationship With a Patient Other Than One Instance with Cristy S</u>.

The Government made a focus of its case-in-chief that Bynes prescribed to women with whom he had a coercive sexual relationship—not as a physician acting within the usual course of professional practice for a legitimate medical purpose. Bynes expressly denied any wrongdoing other than one sexual encounter with one patient:

| | |
|---|---|
| Government Counsel: | Now you talked about Cristy [S.] You had sex with Cristy [S.]? |
| Bynes: | That's correct. |
| Government Counsel: | One time is what you said? |
| Bynes: | That's correct. |
| Government Counsel: | That was the only patient you ever had sex with? |
| Bynes: | That's correct. |
| Government Counsel | That was the only occasion you ever had sex with a patient? |
| Bynes: | That's correct. |

Tr. 669:5–14.

At trial, significant evidence showed that Bynes had a sexual relationship with multiple female patients. Indeed, Bynes acknowledged later a second sexual

8

relationship with Cristy. *See* Tr. 669. Other female patients likewise testified as to their sexual relationships. *See*, *e.g.*, Tr. 270; Tr. 333.

In summary, Bynes willfully made material false statements under oath at trial, and his offense level should be increased by two levels under Section 3C1.1.

## II.   FRANK BYNES' CONDUCT WARRANTS A WITHIN-GUIDELINES SENTENCE OF 293 MONTHS.

The United States submits that a total sentence of 293 months of imprisonment is appropriate under 18 U.S.C. § 3553. In fashioning the appropriate sentence in any case, the Court should consider not only federal sentencing guidelines, but also the factors set forth in 18 U.S.C. § 3553(a). The court, in determining the particular sentence to be imposed, shall consider–

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

18 U.S.C. § 3553(a). As to this case, three factors warrant a high-end guidelines sentence: (1) the size and scope of Bynes's pill mills were unprecedented and not fully captured by the drug quantity calculation, (2) Bynes exploited a large number of particularly vulnerable patients, and (3) while operating his pill mill, Bynes pretended to be law enforcement in order to intimidate his patients.

### A.   Frank Bynes's Pill Mill Was Unprecedented in Scope and Threat to the Community.

Over the course of only a couple of years, Bynes created and fueled one of the largest pills mills this community has ever seen. During trial, the Court saw fourteen

examples of Bynes's prescribing. To calculate the drug quantity for purposes of establishing the guideline range, <u>thirty-four</u> patients were included because each had been reviewed by an expert. Based on just this sample alone, Bynes was responsible for 11,000 kilograms of converted drug quantity.

In addition to these 34 patients, Bynes wrote tens of thousands of prescriptions for more than <u>1,800</u> additional patients. *See* Exhibit A (identifying nearly 1,800 additional patients of Bynes who received controlled substances during the time period at issue in the trial). None of the pills prescribed by Bynes to these individuals are included in the guidelines calculations. Yet, even a cursory review of Exhibit A reveals that the "cocktail" of dangerous drugs discussed at trial was a common theme across his practice. In under a three year period, Bynes wrote prescriptions that led to over 51,000 pharmacy fills in Georgia alone totaling in excess of 4.6 million doses of pills, opioid patches, and other controlled substances. The thousands of others who received the same cocktail should be a factor considered as part of the nature and circumstances of the offense.

B.    **Frank Bynes Exploited Vulnerable Patients Who Needed Help**.

As described in detail by numerous witnesses at trial and as displayed in graphic fashion through photographs admitted at trial, Bynes specifically exploited individuals—including countless young women—who were particularly at risk. This is an aggravating factor that supports a sentence at the top of the Guidelines.

The devastating impact that Bynes had on the health and wellbeing of countless patients—who needed real help—is a central factor that should be

considered under 18 U.S.C. § 3553(a). Numerous patients testified at trial about how the opioids that Bynes handed out fueled their addictions and wrecked their lives:

### Jennie T.

| | | |
|---|---|---|
| Government Counsel: | | Now, Ms. [T.], have you struggled with addiction for your whole life? |
| Jennie T.: | | Yes, sir. |
| Government Counsel: | | And were you addicted to the pain medication that Dr. Bynes prescribed? |
| Jennie T. | | After I started taking them, I was. |
| Government Counsel: | | And when Dr. Bynes' clinic was shut down, did you experience withdrawal symptoms? |
| Jennie T: | | I did. |
| Government Counsel: | | And could you explain what that felt like? |
| Jennie T.: | | I felt like I was going to die. |
| Government Counsel: | | And did you turn to street drugs at that point? |
| Jennie T.: | | I did. |
| Government Counsel: | | What types of drugs did you turn to? |
| Jennie T.: | | Heroin. |

Tr. 313:15 through 314:4.

### Ginger L.

| | | |
|---|---|---|
| Government Counsel: | | How did these types of prescriptions make you feel? |
| Ginger L.: | | Sleepy a lot of the time. It was hard to -- to function daily. I got in a few wrecks during that time. And I |

|  |  |
|---|---|
|  | realized it was too much for me, so I didn't -- I backed off because I had kids, and I didn't -- I didn't want to be like a zombie basically is what I felt like. I was in slow motion. And I don't remember a lot of things. There's like -- it's kind of like -- I felt like a slide show of my life during that time. I don't remember some things of my life. |
| Government Counsel: | Were your family members concerned about the prescriptions that you were receiving from Dr. Bynes? |
| Ginger L.: | Yes, very concerned. My mother, she also struggled with opiate addiction, and she come to me a few times worried that I wasn't going to wake up the next morning because I was taking so much. She was scared. |

Tr. 335:2–16.

Evidence also included numerous examples of overdoses during treatment by Bynes. Sylvia C. and Kimberly W. were two examples where struggles with substance abuse were documented in Bynes's own files—yet, Bynes continued to prescribe lethal quantities of controlled substances without any legitimate effort at treatment. Several patients also testified about their own overdoses:

### Jessica D.

| Government Counsel: | Could you explain a little bit more about that time with your daughter where you were unresponsive? |
|---|---|
| Jessica D.: | I had taken my medicine like I was prescribed, and I eventually took half of what I was supposed to take. She said I just lay there on the couch for almost 28 hours and I didn't move. |
| Government Counsel: | Did your husband call the ambulance? |

|  |  |
|---|---|
| Jessica D. | Yes. They had give me a shot of Narcan to bring me back. |

Tr. 275:10–17.

### Cristy S.

|  |  |
|---|---|
| Government Counsel: | Have you ever overdosed on pills prescribed by Dr. Bynes? |
| Cristy S.: | Yes. |

Tr. 298:20–21.

The Court also heard and saw evidence of the impact of Bynes's drug distribution on the patient's families. There is perhaps no more heartbreaking example of the devastating impact of Bynes's prescribing on families than Sylvia C.—where a minor child could not even be held by a parent because the parent was so incapacitated she was simply incapable of caring for her baby.

What's more, as with the quantity, what the jury heard during trial about the impact on families was just a snapshot of the full scope of Bynes's operation. Following the trial, several individuals contacted law enforcement with their own experiences.

Michael B., for example, relayed the impact Bynes's treatment had on his son[1]—who ultimately died from an overdose while under the care of Bynes:

> I thought if I could just make it through the funeral, I would be okay. What I didn't realize is that it will never be okay. I think of my son every day. I can't leave my neighborhood, nor drive anywhere in town without seeing a reminder of him.

---

[1] K.B.'s patient file was included in the series of 34 boxes displayed for the jury at trial of individuals to whom Bynes prescribed pills and no other treatment.

Denise P. emailed investigators about the harm that Bynes caused to both her and her whole family:

> When I would go into the office I would be crying and he began putting his hands on my thighs and hugging me and pushing his chest against my breast, (sic) I would push him back after a few minutes. Within 3 months I dropped down to 110 lbs. I had no insurance so he was my only option. My husband ended up leaving me [and] my daughter would [not] let me see my grandson and she wouldn't speak because I was either sleeping for 3 and 4 days at a time and when I would wake up I was violent so I would take more pills and go to sleep.

Exhibit B.

Martha J., also a patient of Bynes, texted a statement to investigators about her daughter,[2] who passed away on September 13, 2016, while under the care of Bynes:

> September 20 2016 was the worst day of my life[.] i got a call saying my daughter had passed of a drug overdose[.] know parent should ever have to bury there child[.] losing her has destroyed me[.] I'm not the same person i was since i lost her[.] Dr Bynes new better than to give my daughter 11 different medications[.] i had told him not to give her all that medication but he didn't care[.] he took my only daughter away from me and my grandkids mother they will never know there mother[.] as I'm writing this tears are falling[.] I miss my baby so much[.] iv had to start counselor but it's not helping there's not a day that goes by that i don't cry[.] I can't sleep eat or do anything i once did all because Dr Byrnes didn't care who he hurt my heart goes out to all the parents and the ones he got addicted[.]

Exhibit B (including a series of statements sent by patients and their families after trial).

The Government will not reiterate the mountain of evidence showing that Bynes had inappropriate sexual relationships with numerous women who were

---

[2] C.M.'s patient file was included in the series of 34 boxes displayed for the jury at trial of individuals to whom Bynes prescribed pills and no other treatment.

supposed to be receiving legitimate medical treatment from him. Exhibit B, as well as the Pre-Sentence Investigation Report, describes additional individuals who reported Bynes's inappropriate sexual advances in the context of his medical treatment. That Bynes chose to use the privilege to prescribe as a form of currency to coerce individuals into paying cash (sometimes despite having insurance) or to solicit sexual favors, is another factor that supports a sentence at the top of the Guideline range.

### C. Frank Bynes Falsely Represented Himself to Be Law Enforcement to Intimidate Patients.

At trial, the Government presented significant evidence that Bynes represented himself as a law enforcement officer, including an officer of the Drug Enforcement Administration and the Department of Justice, to various patients. As with Bynes's exploitation of patients, that Bynes showed people a fake badge and represented himself to be law enforcement to intimidate his patients makes this pill mill operation different than nearly every other. *See* Tr. 272 (discussing how Jessica D. felt "intimidated, scared"); Tr. 334 (discussing how Ginger L. felt "intimidated, It felt like he tried to make me feel like he was superior, that I was beneath him in a way"). Bynes took the term "pill mill" to new depths with his attempt to cloak his illegal operation with the appearance of legitimacy by using a fake badge and lies about his connection to various law enforcement authorities. His decision to attempt to double down on these lies at trial is indefensible. Bynes's false representations regarding law enforcement—representations that were intended to keep patients

from questioning or reporting his criminal behavior—are another factor that supports a sentence at the high end of the guideline range.

## CONCLUSION

The Court should sentence Frank Bynes to a within-guideline sentence of 293 months of incarceration. The Court should impose a sentence consistent with the tragic and callous actions of the defendant in this case. A term of imprisonment of 293 months is a significant amount of time, but this sentence is necessary given the egregious nature of his conduct and the devastating impact that Frank Bynes, Jr. has had on the lives of his patients and their families.

Respectfully submitted this 7th day of February, 2020.

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

*/s/ J. Thomas Clarkson*
Assistant United States Attorney
Georgia Bar No. 656069
Email: thomas.clarkson@usdoj.gov

*/s/ Matthew A. Josephson*
Assistant United States Attorney
Georgia Bar. No. 367216
Email: Matthew.Josephson@usdoj.gov

Post Office Box 8970
Savannah, Georgia 31412
Telephone: (912) 652-4422

**CERTIFICATE OF SERVICE**

This is to certify that I have on this day served all parties in this case in accordance with the notice of electronic filing ("NEF"), which was generated as a result of electronic filing in this Court.

This 7th day of February, 2020.

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

*/s/ J. Thomas Clarkson*
Assistant United States Attorney